# CANADA SUGAR REFINING COMPANY *v.* INSURANCE COMPANY OF NORTH AMERICA.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 69.  Argued October 26, 1899. — Decided January 8, 1900.

This is a case where the owners of a cargo of sugar had insured the same in the Atlantic Mutual Insurance Company, on and before April 29, 1893, at and for the sum of $166,145; and had, on April 29, 1893, insured the

profits on the cargo against total loss only in the sum of $15,000 in the Insurance Company of North America. On July 6, 1893, the ship, while on her voyage, stranded on the coast of Newfoundland, became a total loss, and the voyage came to an end. The master, representing all concerned, contracted with local fishermen to give them one half of the sugar they could save. On July 8, 1893, the insurers of the cargo, having been notified of the disaster, took charge and possession of the remnants of the cargo, and purchased from the salvors the portion which, under the agreement with the master, was theirs. The sugar was then transported by a vessel chartered by the insurers, and on their account, to Montreal. The value of the sugar that reached Montreal was about $20,000, and the expenses, salvage charges and the additional freight from Newfoundland to Montreal, paid by the Atlantic Mutual Insurance Company, exceeded $11,000. The insurers on the cargo settled with the refining company as for a total loss under its policy for $166,145, and the sugar saved was turned over to the refining company in part settlement of that sum on the basis of the average *pro rata* policy valuation. The value of the entire cargo on April 29, 1893, when the insurance on profits was effected, was alleged in the libel and admitted in the answer to have been about $181,000. The insurance company contested its liability upon the policy on profits on the ground, chiefly, that the receipt by the libellant of a portion of the sugars, viz., about $20,000 in value, prevented the loss from being total within the terms of the policy. *Held*

(1) That the saved remnants of the sugar were taken exclusive possession of by the agents of the Atlantic Mutual Insurance Company, were by them forwarded on account of that company to Montreal, and were finally turned over to the Canada Sugar Refining Company, at an agreed valuation, in part payment of the claim of the latter for total loss of cargo;

(2) That the facts disclose an actual abandonment by the Canada Sugar Refining Company, to the Atlantic Mutual Insurance Company, and the acceptance by the latter of such abandonment. Owing to the prompt action of the insurance company in taking charge and control of the cargo, and in adopting the agreement of the master with the salvors, it was not necessary for the assured to go through with all the usual forms of an abandonment. Neither of the parties seems to have acted upon the supposition that any other or more formal act of abandonment was necessary;

(3) That the libellant is entitled to recover the amount of the profits as valued in the policy.

THE Canada Sugar Refining Company, a Canadian corporation, on November 27, 1894, filed a libel and complaint in the District Court of the United States for the Southern District of New York against the Insurance Company of

North America, a Pennsylvania corporation, to recover insurance effected by the libellant with the respondent in the amount of $15,000 on profits on a cargo of sugar shipped on board the British ship John E. Sayre, at and from Iloilo to Montreal, Canada. The respondent answered, the cause came on to be heard upon the pleadings, proceedings and proofs, and resulted, June 15, 1897, in a decree in favor of the libellant for the full amount of the insurance, with interest and costs. The case was taken on appeal to the United States Circuit Court of Appeals, where, on April 23, 1898, a final decree was entered reversing the decree of the District Court, and ordering that the libel be dismissed, with costs in both courts to the appellant.

On the libellant's petition, on May 10, 1898, a writ of certiorari was granted, under which the cause and the record and proceedings therein were removed into this court.

The material facts of the case were as follows:

On April 29, 1893, the respondent company insured for the libellant's benefit:

" $15,000 on profits on cargo sugar; against total loss only; valued at sum insured; shipped on board the British ship John E. Sayre at and from Iloilo to Montreal."

At that time the Sayre was at sea prosecuting the voyage. The libellant had 2462 tons of sugars on board of her, amounting in value to $181,000, and had just completed insurance of the sugars to the amount of $166,145 in the Atlantic Mutual, of which insurance the respondent was informed before its insurance on profits was made. In July following the Sayre stranded on the coast of Newfoundland, and all the cargo was lost excepting about 300 tons, which was saved by the aid of salvors, of which one half went to them as their agreed compensation. The agreement was originally made by the master soon after the stranding; but a few days afterwards the agent of the Atlantic Mutual appeared, to whom the master turned over the salvage operations. He confirmed the previous agreement with the salvors; reimbursed to the master the expenses already incurred by him, and thenceforward, with the libellant's consent and the defendant's

knowledge and acquiescence, took the complete control and disposition of the cargo. The agent eventually bought from the salvors the moieties of the sugars allotted to them under the agreement, and then shipped all the sugar saved to the order of the insurers to Montreal. The value of all the sugar that reached Montreal was about $20,000, and. the expenses and salvage charges paid by the Atlantic Mutual thereon, and the additional freight to Montreal, exceeded $11,000, so that out of the whole cargo worth $181,000 less than $9000 net was saved. The Atlantic Mutual settled with the libellant as for a total loss, under its policy of $166,145, and it turned over the sugars saved in part settlement of that sum, on about the basis of the average *pro rata* policy valuation. The respondent contested its liability upon the policy on profits on the ground chiefly that the receipt by the libellant of a portion of the sugars, viz., about $20,000 in value, prevents the loss from being "total" within the terms of its policy.

*Mr. Wilhelmus Mynderse* for the Sugar Refining Company.

*Mr. Clifford A. Hand* for the Insurance Company.

MR. JUSTICE SHIRAS, after making the above statement, delivered the opinion of the court.

The District Court held that, by the stranding of the vessel John E. Sayre, there had been caused, under the provisions of the contract of insurance between the Canada Sugar Refining Company and the Insurance Company of North America, a total loss of profits, and accordingly entered a decree in favor of the libellant for the full amount of the insurance, with interests and costs. 82 Fed. Rep. 757.

The Circuit Court of Appeals, being of the opinion that there had not been a total loss of profits within the meaning of the contract, reversed the decree of the District Court, with directions to dismiss the libel. 58 U. S. App. 22.

This difference of opinion arose from opposite views of the legal conclusion to be drawn from the evidence of the facts

attending the loss of the vessel and its cargo. Did those facts disclose a total loss of the cargo, and, consequently, a total loss of profits? Or did they disclose that, within the meaning of the contract, a portion of the cargo was delivered to and received by the insured at the port of destination, and that, therefore, there was not a total loss of profits?

On February 10, 1893, the ship John E. Sayre, having on board a cargo of sugar belonging to the Canada Sugar Refining Company, sailed from Iloilo for Montreal. By several contracts of insurance between the refining company and the Atlantic Mutual Insurance Company the latter had insured the former against the loss of the cargo in the sum of $166,145. On April 29, 1893, the ship being still on her voyage, the refining company entered into a contract with the Insurance Company of North America, of which the material terms were as follows:

"This to certify that, on the 29th day of April, 1893, this company insured under policy 117,407, made for Robert Hampson, fifteen thousand and $\frac{00}{100}$ dollars on profits on cargo sugar against total loss only, valued at sum insured, shipped on board of the Br. ship John E. Sayre at and from Iloilo to Montreal, and the loss, if any, subject to the terms and conditions of the policy, has been made payable to the order of Canada Sugar Refg. Co. Ltd. on surrender of this certificate."

It was provided in the policy referred to in the certificate that "the acts of the insured or assurers, or of their joint or respective agents, in preserving, securing or saving the property insured, in case of damage or disaster, shall not be considered or held to be a waiver or acceptance of abandonment;" and likewise, "it is further agreed that if the said assured shall have made any other insurance upon the premises aforesaid, prior in date to this policy, then this insurance company shall be answerable only for so much of the amount as such prior insurance may be deficient towards fully covering the premises hereby insured, without any deduction for the insolvency of all or any of the underwriters, and shall return the premium upon so much of the sum by them insured as they shall be by such prior insurance exonerated from."

It is admitted that notice of the prior insurance was given to the Insurance Company of North America at the time when it entered into its contract with the refining company; nor does it appear that the insurance company, before the libel was filed, claimed that it was exonerated from any portion of its liability by reason of such prior insurance, or ever tendered a return of any part of the premium by reason of any such alleged exoneration.

On July 6, 1893, the ship stranded on the coast of Newfoundland, and ultimately became a total wreck. The crew left the vessel, but the master remained, and, in the discharge of his duty as agent of all whom it might concern, made an arrangement with the local fishermen for the saving of cargo by them at one half of what was saved. This resulted in removal from the wreck of a portion of the cargo until July 8, when the work was finally abandoned. On that day an agent of the Atlantic Mutual Insurance Company arrived in the interest of that company. He at once took charge, and relieved the master, who, under instructions of the owner of the vessel, turned over the rescued portion of the cargo to the agent. The previous disbursements made by the master, amounting to $200, were paid to him by the agent of the Atlantic Mutual Insurance Company.

The agent thereupon adjusted the claims of the salvors, in pursuance of the agreement made by the master. The portion saved from the wreck weighed about 320 tons, of which about one half was apportioned and set off to the salvors; but nearly all of the sugars so assigned to the salvors were subsequently purchased from them by the agent.

The agent likewise paid to the shipowner his ocean freight, and reconditioned the sugars saved from the wreck, placed them in new bags, and then shipped them to Montreal on the coasting steamer Tiber. The total expenditures of the Atlantic Mutual Insurance Company, in respect of the salvage, the care, reconditioning and forwarding of the sugars, amounted to upwards of ten thousand dollars — not including the ocean freight, nor the freight from Newfoundland to Montreal.

Thus far, in the history of the transactions, there seems to

be a substantial agreement between the statements of the courts below of the facts upon which they based their respective judgments. But we here meet with a difference, which, in the view we take of the case, is of controlling importance.

The District Court, in the opinion by Judge Brown, states that the agent of the Atlantic Mutual Insurance Company, after having settled with the master and with the salvors, "shipped all the sugar saved, to the order of the insurers to Montreal;" and that "none of the sugar ever came to the libellant in the ordinary course of the voyage, or through any delivery to the libellant as consignee by the carrier; but only through a delivery by the insurer of cargo, after a practical abandonment to the latter, and through a settlement by the insurer as upon a total loss, in which the sugar was received by the libellant upon an equitable basis in part payment, and as the equivalent of its value in cash, as any other property might have been received."

The Circuit Court of Appeals, in its narration of events, states that "the master was about to arrange for the transportation to Montreal of the part not going to the salvors, when the Atlantic Mutual Insurance Company, which meantime had been informed of the disaster, intervened and took entire control. That company carried out the agreement made by the master with the salvors, paying them an equivalent in lieu of one half of the sugar saved, and caused the sugar saved to be reconditioned and shipped to Montreal on the steamer Tiber, and delivered upon arrival there to the libellant."

Referring to the pleadings, we find it averred in the libel that the sugar, after having been brought to Montreal by the Atlantic Mutual Insurance Company, "was received by the libellant on account of and in part payment for the loss sustained by the said libellant, under its insurance with the Atlantic Mutual Insurance Company, and that credit was given therefor to the said Atlantic Mutual Insurance Company in the amount at which the said 325 tons of sugar were insured with the said the Atlantic Mutual Insurance Company; and that the market value of the said 325 tons of

sugar in Montreal at the time it was received by the libellant was about $20,000."

The responsive allegations of the answer were as follows: " This respondent further admits and avers, upon information and belief, that from the wreck of said ship John E. Sayre there were forwarded to Montreal, the place of destination, and there delivered to and received by the libellant, about nine thousand nine hundred mats of the said sugar of about three hundred and twenty-five tons' net weight, and of the value of about twenty thousand dollars," and " this respondent, upon information and belief, denies that the sugar so delivered to the libellant was a payment by any underwriter on account of a supposed total loss."

The evidence under this issue, on the part of the libellant, consisted chiefly of the bills of lading, three in number, and dated August 4, 1893, given by the master of the steamer Tiber to Harvey & Co. of St. Johns, N. F., and calling for the delivery of the saved sugar to the Atlantic Mutual Insurance Company at Montreal; and of the testimony of Drummond, of Harvey and of Pike. Drummond testified that he was president of the Canada Sugar Refining Company; that, as such, he made a settlement with a representative of the Atlantic Mutual Insurance Company at Montreal, whereby about three hundred tons of sugar were accepted by the refining company from the Atlantic Insurance Company, at market rates of value, in part payment of the claim of the refining company against the Atlantic Mutual Insurance Company for total loss of cargo; that the sugar was shipped from Newfoundland to the Atlantic Mutual Insurance Company at Montreal, and, in the opinion of the witness, belonged to the insurance company at the time of the settlement.

Harvey testified that he was a member of the firm of Harvey & Co., commission merchants, St. Johns, Newfoundland; that in July and August, 1893, his firm acted for the Atlantic Mutual Insurance Company, under instructions from that company; that his firm acted through Robert G. Pike as their representative; that the sugar saved from the wreck of the John E. Sayre was forwarded to Montreal to the order of the

Atlantic Mutual Insurance Company; that for expenses incurred by his firm in paying the salvors, the master's expenses, and for storing, weighing, reconditioning and reshipping the sugar, their firm received payment from the Atlantic Mutual Insurance Company in the sum of $10,066.97; that, at no time, either before or after the wreck of the John E. Sayre, did his firm have any connection with or receive any instructions from the Canada Sugar Refining Company, or any of its officers or agents, or with the owners of the John E. Sayre.

Pike testified that he was sent by Harvey & Co. to the scene of the wreck; that he there, on July 8, 1893, took entire charge of the sugar that had been saved; that he settled with the master and with the salvors; that he reconditioned the sugar and shipped it to Montreal, to the Atlantic Mutual Insurance Company; that everything he did was in pursuance of instructions from Harvey & Co., as agents of the Atlantic Mutual Insurance Company of New York; that he never at any time had any communication with the Canada Sugar Refining Company, or their officers or agents.

In the absence of any evidence offered under this issue by the Insurance Company of North America, we think it clear that the saved remnants of the sugar were taken exclusive possession of by the agents of the Atlantic Mutual Insurance Company, were by them forwarded on account of that company to Montreal, and were finally turned over to the Canada Sugar Refining Company, at an agreed valuation, in part payment of the claim of the latter for total loss of cargo.

It is also evident, as we think, that the facts disclose an actual abandonment by the Canada Sugar Refining Company to the Atlantic Mutual Insurance Company, and the acceptance by the latter of such abandonment. Owing to the prompt action of the insurance company in taking charge and control of the cargo, and in adopting the agreement of the master with the salvors, it was not necessary for the assured to go through with all the usual forms of an abandonment. Neither of the parties seems to have acted upon the supposition that any other or more formal act of abandonment was necessary.

In *Columbian Insurance Co.* v. *Catlett*, 12 Wheat. 394, where the effect of actual abandonment, as dispensing, if accepted, with formal notice, was considered, Justice Story said :

" The latter gives notice of an intention to abandon, because in its terms it includes an actual abandonment. It has a tacit reference to the clause in the policy, and must be deemed as a notice to abandon, and, at the same time, a declaration that it shall operate as an abandonment in the case, as soon as by law it may. In our judgment, it was a continuing act of abandonment, and became absolute at the end of the sixty days. It was an abandonment *in præsenti*, to take effect *in futuro.* Neither the form of the notice, nor the abandonment, is prescribed in the cause. They may be in one or two instruments ; they may be in direct terms, or by fair and natural inference. It matters not how they are given or executed ; it is sufficient, in point of fact, that they have been given or executed."

" If an abandonment is wanting in any formality the insurer may waive all objection, and they do this by calling for the proof and acting as if the abandonment were altogether sufficient." (2 Parsons on Maritime Law, 398.)

" The rule dispensing with any particular form of abandonment amounts substantially to the rule that it is sufficient for the assured to signify distinctly that he abandoned, and he could not signify this more distinctly than by claiming a total loss. I therefore conclude that the claiming of a total loss is a sufficient expression of an intention to abandon." (2 Phillips on Insurance, 387.)

As the Canada Sugar Refining Company and the Atlantic Mutual Insurance Company agreed upon an actual abandonment and settled on the basis of a total loss, it is not perceived that, in the absence of any allegation or proof of fraud, the Insurance Company of North America can be heard to raise any question as to the formality of the proceedings.

It was suggested, but apparently was not pressed at the argument, that there ought to have been an abandonment to the Insurance Company of North America. In *Mumford* v.

*Hallett*, 1 Johns. 433, where there were separate contracts of insurance on cargo and on profits, and where it was contended that the assured, by having abandoned the goods to the underwriter, had disabled himself from recovering the insurance on profit, it was said:

" But admitting that this is to be regarded as a valued policy, it is said that the assured, by abandoning the cargo to its underwriters, has put it out of the power of the defendant to receive any salvage on the profits, and that, therefore, he has no right to recover in this suit. This is a dilemma which the defendant ought to have foreseen at the time of his subscription. He must have supposed there was a policy on the cargo, which, in case of disaster, would naturally be abandoned to those who had insured it. It is idle to complain of what must have been clearly his own understanding of the contract; nor is it reasonable in him to expect, that, for the purpose of recovering on a small policy on profits, a merchant should, by not abandoning the cargo, forego his insurance on that subject."

We shall content ourselves in this respect by quoting the conclusion expressed in 2 Phillips on Insurance, sec. 1503:

" A policy upon expected profits does not seem to offer anything upon which an abandonment can operate, and it does not appear from any speculation, or any judicial opinion, relating to this subject, which has come to my knowledge, that an abandonment of this interest can be of any importance to the underwriters, otherwise than as a notice that a total loss is claimed ; and if this is its only effect, an abandonment is not necessary. ' . . . Under an abandonment of freight, the underwriters may, in some instances, avail themselves indirectly of what has been done towards earning freight. They may receive the freight *pro rata itineris per acti*, for the part of the voyage performed previously to the event on account of which the abandonment is made. But not so of profits ; there is no profit, or anything like a profit, *pro rata itineris per acti*, which can be assigned, or proved to be of any value to the insurer. It does not appear, therefore, that an abandonment of profits can be anything more than a nugatory ceremony. . . . It has never been hinted that the assured

can make any claim upon the insurers for the profits on goods abandoned to them, and if he has no such right, he cannot transfer it to the underwriters on profits or to any other persons."

To briefly rehearse the facts, this is a case where the owners of a cargo of sugar had insured the same in the Atlantic Mutual Insurance Company, on and before April 29, 1893, at and for the sum of $166,145; had, on April 29, 1893, insured the profits on the cargo against total loss only in the sum of $15,000 in the Insurance Company of North America; on July 6, 1893, the ship, while on her voyage, stranded on the coast of Newfoundland, became a total loss, and the voyage came to an end; the master, representing all concerned, contracted with local fishermen to give them one half of the sugar they could save; on July 8, 1893, the insurers of the cargo, having been notified of the disaster, took charge and possession of the remnants of the cargo, and purchased from the salvors the portion which, under the agreement with the master, was theirs; the sugar was then transported by a vessel chartered by the insurers, and on their account, to Montreal; the value of the sugar that reached Montreal was about $20,000, and the expenses, salvage charges and the additional freight from Newfoundland to Montreal, paid by the Atlantic Mutual Insurance Company, exceeded $11,000; the insurers on the cargo settled with the refining company as for a total loss under its policy for $166,145, and the sugar saved was turned over to the refining company in part settlement of that sum on the basis of the average *pro rata* policy valuation. The value of the entire cargo on April 29, 1893, when the insurance on profits was effected, was alleged in the libel and admitted in the answer to have been about $181,000.

The error of the Circuit Court of Appeals, as we view the case, was in regarding the portion of the cargo that was saved and paid for by the Atlantic Insurance Company as having been carried to Montreal and there delivered to the refining company as the owner thereof, and as respects which, in that state of facts, the refining company should be deemed to have received profits on a part of the cargo.

Without finding it necessary to enter into a discussion of refined distinctions, considered in some of the cases, between an actual and a technical total loss, we think it evident that the refining company would not receive the indemnity for which it bargained and paid unless it is permitted to recover in the present case.   By such recovery it will not receive more than will, with what it has received from the Atlantic Mutual Insurance Company, make up its whole loss.

It certainly cannot be successfully claimed that, in order to recover, the refining company was bound, in this suit on a valued policy on profits, to put in evidence to show that it would have received profits if the voyage had been completed, and the entire cargo had arrived safely.   Such a contention was considered and determined in *The Patapsco Ins. Co.* v. *Coulter*, 3 Pet. 222.   That was a case where the ship Mary was proceeding on a voyage from Philadelphia to Gibraltar and ulterior ports with a cargo of flour.   There was an insurance on profits in the sum of five thousand dollars.   While the vessel lay at Gibraltar, before the discharge of her cargo, she and her cargo were totally lost by fire.   In an action brought on the policy of insurance on profits in the Circuit Court of the United States for the District of Maryland, the court was asked to instruct the jury that as the assured had offered no evidence that the flour, if delivered and sold at Gibraltar, would have yielded a profit, they were not entitled to recover.   The refusal of the court so to charge was approved in this court, in an opinion by Mr. Justice Johnson, from which we quote, as follows:

. " The third prayer for instructions is in these words: ' That the plaintiffs had offered no evidence that the sales of the flour at Gibraltar would have yielded the plaintiffs a profit, and that, therefore, they were not entitled to recover.'   This was refused, and the question is, whether the defendants were entitled to it, as prayed.

" This instruction presents two propositions: 1. That it was necessary to prove loss of profits, otherwise than by the loss of the cargo.   2. That the plaintiff was limited to proof of profits on a sale at Gibraltar.   With regard to the second it is clear

that the instruction was properly refused, for there was nothing in the policy to prevent the assured from proceeding with the original cargo to the Pacific, although the course of trade would have sanctioned him in selling and replacing it. But the first proposition is one of more difficulty.

" Courts of justice have got over their difficulties on the question whether profits are an insurable interest, but how and where that interest must be established by proof, in case of loss, is not well settled. Here again there appears to be a conflict between the British and American decisions.

" The earliest of the British decisions, that of *Barclay* v. *Cousins*, 2 East, 544, certainly supports the doctrine that the profits sink with the cargo, or at least that the loss of one is *prima facie* evidence of the loss of the other, and throws the *onus probandi* upon the defendant. Such is the intimation of the court, and the recovery was had in that case without proof that profit would have been made had the cargo arrived at the destined port. In the case of *Henrickson* v. *Margetson*, 2 East, 549, of which a note was given in that case, the recovery was also had without proofs that the profits would have been made, or any other proof than an interest in and loss of the cargo; and Lord Mansfield seems to have suggested the true ground for dispensing with such proof, to wit, the utter impracticability of making it, without the spirit of prophecy to determine the precise time when the vessel would arrive at her destined port.

" The two subsequent cases which are cited in the elementary books to sustain the contrary doctrine are not full to the point. In that of *Hodgson* v. *Glover*, 6 East, 316, there was another question of as great difficulty, to wit, Whether, in a clear case of average loss, the plaintiff could recover as for a total loss, or recover anything without evidence to determine the average. Of the four judges who sat, two decided against the plaintiff, upon the one ground, and two upon the other.

" In the second case, that of *Eyre* v. *Glover*, 12 East, 218, although the point was touched upon in argument, yet the court neither expressly affirm nor deny it; it was not the leading question in the cause; and at last judgment is rendered for

plaintiff without requiring such proof.   But the case of *Mumford* v. *Hallett*, 1 Johns. 489, goes further.   It was a case of insurance on profits, in which there was no evidence given that profits would have been made upon an arrival, nor was any other loss proved than as an incident to the loss of the goods. On that state of facts, Livingston, Justice, who delivers the opinion of the court, remarks : ' It does not follow that a profit will be made if the cargo arrived, yet its loss would give a right to recover on such a policy.'   There were other questions in the case ; but, after all were settled, this principle was essential to the plaintiff's right to recover.   In the case of *Fosdick* v. *The Norwich Insurance Company*, decided in the Supreme Court of Errors of Connecticut, the question was moved in argument that to justify a recovery the plaintiff must show that profits would have accrued upon safe arrival of the goods ; but the language of the court, in expressing their decision, is not so explicit as to enable us to determine whether it was intended to apply as well to the proof of loss as to the insurable interest.   Yet the right of the plaintiff to recover being affirmed in that case without other proof than the loss of the goods, it would seem to be an authority for the doctrine that no other was necessary.

" The report furnishes no other proof of loss of profits than what was implied in the loss of the cargo in which the insured had an interest.   And on the question of insurable interest, which was the main question in the cause, the Chief Justice asks, ' if profits are anything more than an excrescence upon the value of goods beyond the prime cost ? '

" As to the American cases, Mr. Phillips quotes that of *Loomis* v. *Shaw*, (if I understand his language as he meant to use it,) as going farther than the case warrants.   2 Johns. Cas. 36.   The court waives the question now under consideration by suggesting that the defendant had waived it by an act of his own.

" In the case of *Abbott* v. *Sebor*, 3 Johns. Cas. 39, which was a motion for a new trial, the decision turned chiefly on the question whether the court had misdirected the jury in instructing them that the plaintiff must recover the whole

sum insured on profits or nothing — that is, that he could not recover for an average loss. The question, if proof that profits would have been made had the vessel arrived in safety was necessary to his recovery, was not touched. Yet the right to recover is affirmed in that case, and it does not appear that any proof to that effect had been offered or required beyond 'the loss of the goods on which the profit was expected. But the authority amounts to no more than an implication.

"We must now dispose of the question upon reason and principle; and here it seems difficult to perceive why, if profit be a mere excrescence of the principal, as some judges have said, or an incident to or identified with it as others have said, the loss of the cargo should not carry with it the loss of the profits. This rule has convenience and certainty to recommend it, of which this case presents a striking illustration. Here was a voyage of many thousand miles to be performed; the final profits of which must have been determined by a statement of accounts passing through several changes, some of which might have resulted in loss, some in gain; and in each case the good or ill fortune of the adventure turning on the gain or loss of a day in the voyage. What human calculation or human imagination could have furnished testimony on a fact so speculative and fortuitous? To have required testimony to it would have been subjecting the rights of the plaintiff to mere mockery."

The conclusion thus reached has never been disturbed in this court, and is the prevalent doctrine in the United States. The American rule and the reason for it are thus stated in 2 Phillips on Ins. section 1209 :

"Under a policy on the profits of a cargo on a voyage from Philadelphia to the Mediterranean, and thence to South America, valued at $20,000, the ship and cargo were destroyed by fire at Gibraltar. It was held (*Patapsco Ins. Co.* v. *Coulter*, 3 Pet. 222) that the assured was entitled to recover the whole amount of the valuation against the underwriters, without proving that there would have been any ultimate profit on the voyage, if it had been pursued without interruption or disaster. And this is the prevalent doctrine in the

United States. . . . The profit, then, which is the subject of a policy upon this interest is the excess of the value of the subject at the port of destination over its value at the shipping port. It is only in case of loss that the policy is of any avail to the assured, and he wishes that it may avail him in a total as well as partial loss. In the latter case, the loss may be adjusted, under an open policy, on the English doctrine, by ascertaining how much less the profit is than it would have been if the goods had arrived sound.

"But in the case of a total loss by the ship never arriving, it is very difficult to say what the profits would have been had the ship arrived, since it is not possible to determine when she would have arrived; and if this difficulty is got over by assuming some probable time, there must often be a long delay in hearing from a distant port of destination, and learning the state of markets. The prompt return of his capital to the assured in case of loss, which is a very important consideration in insuring, requires a valuation of the profits, in preference to an open policy subject to an adjustment upon the English doctrine of determining the amount by the state of the market at the port of destination. The same difficulty does not arise in case of a loss on goods, which is adjusted on the invoice value. There does not appear to be any way of avoiding this difficulty but by a valuation, and this is felt in practice, since policies on profits are usually valued."

Agreeing, as we do, with the view of the evidence taken by the District Court, to wit, that none of the sugar ever came to the libellant in the ordinary course of the voyage, or through any delivery to the libellant as consignee by the carrier, but only through a delivery by the insurer of cargo, after a practical abandonment to the latter, and through a settlement by the insurer as upon a total loss, in which the sugar was received by the libellant upon an equitable basis in part payment, and as the equivalent of the value in cash, as any other property might have been received, the legal conclusion that we reach is that the libellant is entitled to recover the amount of the profits as valued in the policy.

The appellees claim that they took no part in the settlement

between the cargo insurers and the libellant, and the doctrine of *res inter alios* is invoked.

But they had knowledge of the prior insurance, and were bound to know that, in case of disaster, there was the right to abandon. There is evidence that they were informed of what was going on between the other parties concerned. They do not impugn, by allegation or evidence, the fairness and good faith of that transaction, nor do they claim that it was conducted with a view to prejudice them.

They plant their defence solely on the proposition of fact that a sound portion of the cargo reached the port of destination in due course, and was there delivered to the libellant as consignee — a proposition of fact, as we have seen, not sustained but refuted by the evidence.

Accordingly, the decree of the Circuit Court of Appeals must be

*Reversed, with costs, and the decree of the District Court for the Southern District of New York is affirmed.*