## Commonwealth ex rel. *v.* Fidelity Land Value Assurance Co., Appellant.

Argued May 22, 1933.  Before FRAZER, C. J., SIMPSON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*Harry Shapiro,* for appellant.

*Harold D. Saylor,* Deputy Attorney General, with him *George W. Keitel,* Assistant Deputy Attorney General, and *Wm. A. Schnader,* Attorney General, for appellee.

OPINION BY MR. JUSTICE LINN, June 30, 1933:

The question is whether appellant was engaged in the insurance business, as the Commonwealth contends. Incorporated under the law of Delaware for the purpose of engaging in the real estate business, it registered in this state, May 1, 1930, as a foreign corporation, so engaged. It admits that it "is not authorized by its charter to operate as an insurance company......in the state of its incorporation or......elsewhere, and that it has not been licensed to do business in this Commonwealth in accordance with......the Act of May 17, 1921, P. L. 682, and the Act of May 17, 1921, P. L. 789," regulating insurance. Jury trial was waived.

The learned court below concluded that appellant was engaged in insurance, and entered judgment for the Commonwealth. The judgment must be affirmed.

It is not without interest to note that, since these proceedings began, appellant has eliminated the word assurance from its corporate title by changing its name from Fidelity Land Value Assurance Company to National Realty Valuation Corporation.

Property insurance is a contract against loss governed by principles of indemnity: Com. Insurance Co. v. Sennett, Barr & Co., 37 Pa. 205, 208; Insurance Co. of North America v. Commonwealth, 87 Pa. 173, 183; Com. v. Equitable Beneficial Association, 137 Pa. 412, 419, 18 A. 1112; Com. v. Vrooman, 164 Pa. 306, 318, 30 A. 217; Com. v. Provident Bicycle Association, 178 Pa. 636, 638, 36 A. 197; Com. v. Metropolitan Life Ins. Co., 254 Pa. 510, 514, 98 A. 1072. If the business, as described in the record, is indemnifying against loss, it is insurance, ultra vires, by appellant's admission, and therefore unlawful.

Appellant was engaged in selling what the evidence designates as repurchase bonds or contracts, of which several different forms appear in the record. They are too long for quotation here, but, one of them provides that, on demand, after a given period (generally ten years), appellant will purchase from the holder for a specified price certain real estate. The holder agrees to execute a warranty deed and deliver with it a policy of title insurance insuring a clear title. The bond provides that it shall not "vest any right, title, lien, interest or option to or in favor of any of the parties hereto in or against said property......nor......constitute an incumbrance or restriction against said land, or cloud in any manner or degree whatsoever the title hereto, or restrict the sale and transfer thereof or the consideration to be received therefor, but said property may be, by any holder thereof, sold and transferred as freely in all respects as though this certificate or bond had never been issued, and the privilege of so selling and conveying said property to this company or its order at the date of maturity as herein above mentioned; and accepting the aforesaid sum of money in payment therefor, or of retaining and keeping the said lot or tract of land, free and clear of any liens or claims whatsoever of the company, shall be entirely optional with the person, firm or corporation who shall at the said time of maturity, be the lawful owner of the said property covered hereby, and the registered or otherwise lawful owner hereof."

There is evidence that, one, conducting a real estate development (for example) and wishing to sell lots, may apply to respondent "to use your Fidelity Land Value Assurance Certificates in connection with the sale of our development......" If such application is accepted, the developer and appellant make a contract, pursuant to which, for a premium paid by the developer, appellant issues its repurchase bonds to purchasers of lots from the developer. In one of the contracts, the premium

428

payable by the developer is fixed at 6% of the selling price of the lot. Such bonds in the total amount of $100,000.00 have been issued. To obtain business, appellant circulated advertisements which indicated what it considered the nature of its business. From those in evidence, as stating advantages to the purchaser, and also indicating the character of its contract, the following, from much of the same sort, is quoted: "2. The risk of depreciation is entirely eliminated. Your lot may enhance in value without any limit but you are safeguarded against loss." "3. Fidelity Land Value Repurchase Contracts have made land buying a safe investment." "5. [Such contract] provides an opportunity to participate in the speculative profits of land developments without any risk to the principal."

It sufficiently appears that appellant, for a consideration, paid, either by the developer of real estate, or, as was stated at bar, by any applicant to whom such a contract may be issued, insures against a well known risk, to which all landowners are subject, depreciation from the price paid. No matter what names are used to disguise the transaction, that is the ultimate fact. Under the police power, the conduct of insurance business has been subjected to regulation by the state: Act of 1921, supra; Com. v. Vrooman, supra; O'Gorman et al. v. Hartford Fire Ins. Co., 282 U. S. 251. Accordingly, it is the duty of the court to look through the forms in which the parties state their relations to ascertain whether in fact the relation of insurer and insured exists.* See Marcus v. Heralds of Liberty, 241 Pa. 429, 435, 88 A. 678.

---

* "And, even when in practice it [insurance in its early days] had come to be recognized as a distinct species of contract, it still continued to be disguised under the forms of a sale, an exchange, or a maritime loan, in order to prevent any question whether it was illegal on the ground that it infringed the laws against usury." Holdsworth, The Early History of Insurance, 17 Columbia Law Review 86.

Appellant contends that it makes contracts merely to buy real estate and that such contracts are not insurance; in the brief it is said "defendant's contracts are real estate options"; that appellant agrees to buy the land if the bondholder wishes to sell it; that insurance involves payment against a risk or contingency not under the control of the insured, which, it is said, is wanting here. If there were nothing more than an agreement to buy the land, it would of course not be insurance. But the avowed purpose of the parties is, as appellant advertises, to eliminate the "risk of depreciation," "to safeguard against loss," to avoid "any risk to the principal." An insurer guarantees against loss by an event that may or may not happen. The event specifically contemplated here, as appellant asserts, is depreciation in value of certain land below the price paid; the loss to be indemnified is the amount of that depreciation. In order that insurance may be practicable, it is necessary, in settling the terms on which a policy against property loss may be written, to determine how the amount of loss may be ascertained. In fire insurance, for example, the policy may state a maximum of insurance, leaving the burden of proof of loss on the insured, with recovery limited by the maximum. Or, a valued policy may be issued, generally subjecting the good faith of the valuation to challenge by the insurer if loss occur, unless otherwise limited by law (cf. Orient Insurance Co. v. Daggs, 172 U. S. 557, 565; also, see Richards, Insurance, 4th edition, page 36 et seq.) In marine insurance, to take another example, the determination of the amount of indemnity payable was found to be complicated by the difficulty of ascertaining promptly (frequently at a distance from the loss) whether the loss was total or partial and what the salvage might be. In consequence, there developed the right to declare a constructive loss, give notice of abandonment to the insurer, and claim for total loss, allowing the insurer to recover what, if anything, might be salvaged. (cf. Wat-

son v. Insurance Co. of North America, 1 Binn. 46, 53; Brown v. Phœnix Ins. Co., 4 Binn. 444, 460 et seq.; Jones v. Western Assurance Co., 198 Pa. 206, 47 A. 948; Canada Sugar Refining Co. v. Insurance Co., 175 U. S. 609, 617. See, too, Richards: supra. pages 272-284.)

Diversity of subject-matter necessarily creates differences in the practical conduct of insurance. Looking, now, at appellant's contracts, in the light of the nature of insurance and the illustrations suggested, it is first to be noticed, that ordinarily there must be obvious difficulty in determining, in advance, what rates of premium will prove adequate to raise a fund from which, on principles of average-experience, losses resulting from the great variety of causes producing land-value depreciation, may be paid. It is a new subject of insurance. In addition, account must be taken of the difficulties otherwise frequently arising in proving loss in market value of land or depreciation from price paid for land. As the amount to be paid and received depends on indemnity, the arrangement, which the parties would seek to make, would be such that the insured might not make a profit by the insurance. These difficulties, which would bear on both appellant and its bondholders, they have eliminated from the problem, by agreeing in advance that, on notice at maturity by the holder of a bond that the market value of property has fallen below the price paid for it, instead of requiring the insured to prove the amount of depreciation, the holder will convey the land to the insurer, who (for example, as the insurer in the case of abandonment after constructive loss in marine insurance) must take it, pay the amount agreed on, and, if he choose, salvage as best he may. We think this is insurance and not a mere obligation to buy ten years after date if the holder desires to sell.

In State v. Hogan, 8 N. D. 301, 78 N. W. 1051, it appeared that for a premium of $55.00, Realty Revenue Guaranty Company agreed to buy from its contractee, at $5.00 per acre, his crop of specified grain grown on

110 acres during the coming season, irrespective of the value of the grain, if he elected to sell to the company. It was held that such a contract was insurance. The application was "for an option sale contract of $———— per acre......" The court said "We cannot conceive that the farmer's primary object was to sell his crop. Ordinarily a man does not pay a premium for the privilege of selling his produce. Nor was it the primary purpose of the company to purchase the crop. From the very terms of the contract, it is certain that it must lose money upon all the grain it buys under the contract ......It was a contract by which the guarantor undertook to guarantee or assure the farmer a certain revenue from his land. How did the parties proceed to execute such a contract? It is well known to both parties that an acre of land in this state, farmed as the farmer contracts to farm it in this case, will produce a crop of a value far in excess of $5.00, and the value can be reduced to or below that figure only by the happening of one or more of the contingencies hereinbefore mentioned. But such contingencies may happen, and to be absolutely assured that his land will yield him at least $5.00 per acre, the farmer is willing to pay something......"

In Claflin v. U. S. Credit System Company, 165 Mass. 501, 43 N. E. 293, a contract purporting "to bind defendant, in consideration of a sum paid, to purchase at a fixed price the accounts which during one year a certain business firm should have against ascertained insolvent debtors, against whom execution should be returned unsatisfied," was held to be insurance. See, too, Tebbets v. Mercantile Credit Guarantee Co., 73 F. (C. C. A. 2d cir.) 95; State v. Phelan, 66 Mo. App. 548; Lexington Grocery Co. v. Phila. Casualty Co., 157 N. C. 116, 72 S. E. 870; Shakman v. U. S. Credit System Co., 92 Wis. 366, 66 N. W. 528. In Attorney General v. C. E. Osgood & Co., 249 Mass. 473, 144 N. E. 371, it was held that a so-called installment lease of goods was a contract of insurance. It provided that if the purchaser

432

die, leaving unpaid installments, the seller would "give a receipted bill to the estate of the purchaser" up to $500.00. It was said that "The cancellation of the debt is the equivalent of the payment of money to the estate of the customer." See, too, Ruto v. Italian Burial Casket Co., 104 Pa. Superior Ct. 288, 158 A. 657; Allin v. Motorists Alliance of America, Inc., 234 Ky. 714, Physicians' Defence Co. v. O'Brien, 100 Minn. 490; Physician's Defence Co. v. Cooper, Insurance Commissioner, 188 Fed. 832, 199 Fed. 576.

While differences in result in various states may follow from the application of varying statutory definitions of insurance the cases referred to support the conclusion we have reached, in the light of the general understanding of what insurance is in this state as illustrated in the cases cited above.

The Insurance Law of May 17, 1921, P. L. 682, in section 107, provides: "Except as herein provided, the doing of any insurance business in this commonwealth, as prescribed in this act, for insurance companies, by any private individual, association, or partnership, is prohibited......"

Section 202 (e) provides: "Domestic stock and mutual insurance companies, other than life, and, if their charters permit, foreign companies, may transact any form of insurance not included in this section, if such insurance is not contrary to law, and is allied [to] or in harmony with the classes of insurance herein provided. Such additional insurance shall be transacted only on express license by the insurance commissioner and upon such terms and conditions as are from time to time prescribed by him."

As the statute contains no specific definition of insurance we must apply the word as generally understood in law of the state. In Commonwealth v. Beneficial Association, supra, it was said: "The general object or purpose of an insurance company is to afford indemnity against loss: its engagement is not founded in any phil-

anthropic, benevolent, or charitable principle; it is a purely business adventure, in which one, for a stipulated consideration or premium per cent, engages to make up, wholly or in part, or in a certain agreed amount, any specific loss which another may sustain; and it may apply to loss of property, to personal injury, or to loss of life. To grant indemnity or security against loss, for a consideration, is not only the design and purpose of an insurance company, but is also the dominant and characteristic feature of the contract of insurance."

As appellant was clearly engaged in the business of insurance without power by its charter to do so, the learned court below was right in entering judgment for the Commonwealth, entirely apart from appellant's failure to comply with the insurance law, which, of itself, would sustain the judgment, if appellant had possessed the power to engage in insurance.

Judgment affirmed, appellant for costs.