## Employe Benefit Plans

KANE, *Attorney General,* June 30, 1975—You have requested our advice as to the legality of two types of transactions engaged in by insurance companies: minimum premium agreements and administrative service plans. It is our opinion, and you are hereby advised, that the self-insurance aspect of these programs does not constitute the transaction of insurance business, and that insurance companies may legally enter into minimum premium agreements and administrative service plans under applicable State and Federal laws.

Minimum premium agreements are basically insurance contracts with large deductibles. Such contracts are usually offered to large industrial concerns. For example, a large company may provide accident and health insurance to its employes. In purchasing that insurance, the company may wish to allow for a very large deductible and thus become a self-insurer to that degree. In this situa-

tion, deductibles of $10,000 to $100,000 are not uncommon. The insured saves considerable amounts of money on the premiums through self-insurance, while the insurance company relieves itself of liability for most claims. Another result of such an arrangement is the loss to the Commonwealth of certain premium taxes, since the self-insured deductible is not taxed.

Administrative service plans are often, but not necessarily, tied in with minimum premium contracts. In their pure form, these plans are agreements entered into by insurance companies whereby they underwrite none of the risk for an insured, but only do the administrative work of processing claims. Thus, an insurance company might contract with a large industrial self-insurer to process claims for that company. Usually, the insurance company would be compensated on a service fee basis per claim processed. The insured in that case would be a self-insurer and would assume the actual loss itself. Where the administrative service plan is tied in with the minimum premium agreement, the insurance company would agree to underwrite only losses beyond the large deductible but would administer the lesser losses for the insured.

The magnitude of the deductible in a minimum premium agreement raises the question of whether the self-insuring company is acting as an unlicensed insurance company. In regard to administrative service plans, the question arises whether such a plan is a proper function for an insurance company, since that function is not specifically authorized by the Pennsylvania insurance laws. Involved in the analysis of both questions is the im-

pact of the recently enacted Federal Employee Retirement Income Security Act of 1974 (Pension Reform Act), Pub. L. No. 93-406 (September 2, 1974), 29 U.S.C. §§1001, et seq.

I

Although Pennsylvania courts have not passed upon the question, the courts of several other jurisdictions have held that employer-sponsored insurance benefit programs do not constitute the transaction of insurance business: In State ex rel. Farmer v. Monsanto Co., 517 S.W. 2d 129 (Mo., 1975), the Missouri Supreme Court reversed a lower court decision granting the Insurance Superintendent's suit for an injunction to prohibit Monsanto Company from paying sickness and disability benefits directly to its employes. The Supreme Court rejected the lower court's conclusion that such payments constituted the transaction of insurance *business* under Missouri law, emphasizing that participation in the insurance plan was optional with each employe. The plan was not made available to the public, and Monsanto did not seek to make either a profit or accumulate a surplus from the operation of its sickness and medical benefit plan. This same reasoning was adopted in a similar case by the Arkansas Supreme Court in West & Co. of La., Inc. v. Sykes, 515 S.W. 2d 635 (Ark., 1974).

Both the Monsanto and West opinions rely heavily upon a parallel line of cases holding that the contributions of employers to employer-sponsored benefit programs are not subject to the various States' taxes on gross insurance premiums. In Mutual Life Ins. Co. v. New York State Tax Comm., 32 N.Y. 2d 348, 298 N.E. 2d 632 (1973), the Court

of Appeals determined that the New York tax on "all gross direct premiums" was a corporate franchise fee and was not applicable to the contributions of an insurance company to a program for its own employes because the program lacked the characteristics of solicitation of business or accumulation of profit. The court concluded that:

"The relationship involved, then, is not commercial, nor one of seller and purchaser, with profit or contribution to surplus accruing to the former; rather, it is an incident of its employer-employee relationship, no different from that of any other employer not subject to the taxing provision of section 187. Such *employer-sponsored programs do not constitute the doing of an insurance business within the meaning of the statute. . . .*": 298 N.E. 2d at 635 (emphasis supplied).

Similarly, in Danna v. Commissioner of Insurance, 228 So. 2d 708 (La., 1969), the Louisiana Supreme Court ruled that the contributions of a noninsurance company to its employer benefit program was not subject to a gross premiums tax:

"Payments on a group policy issued by an insurer-employer to its own employees is not business in the usual, ordinary and customary manner. . . . Here there is in effect no purchase of insurance because the contract is not founded on a purchaser-seller basis. Rather, its foundation is primarily the employer-employee relationship, the rationale of which is that mutual interests of each, independent of the coverage provided, will thereby be enhanced for reasons having no direct relationship to the insurance business as such.": 228 So. 2d at 713.

See also California-Western States Life Ins. Co. v.

State Bd. of Equalization, 312 P. 2d 19 (Cal. App., 1957); State Tax Commission v. John Hancock Mutual Life Ins. Co., 170 N.E. 2d 711 (Mass., 1960); Williams v. Massachusetts Mutual Life Ins. Co., 427 S.W. 2d 845 (Tenn., 1968). It is noteworthy that in none of these cases was the loss of premium tax revenues considered any justification for categorizing the programs in question as a species of insurance.[1]

The rationales of the above cases are equally applicable to Pennsylvania insurance laws, which nowhere define the term "insurance." The Insurance Department Act of 1921 applies "to all companies, associations, and exchanges transacting any class of insurance business.": (40 P.S. §23), while the Insurance Company Law of 1921 prohibits "the doing of insurance business in this Commonwealth" except as provided in that act: 40 P.S. §367. Lacking any specific definition of the term "insurance," the Pennsylvania Supreme Court has held that the word must be applied as generally understood in the law of the State, and has recognized that the scope of Pennsylvania insurance laws focuses upon the *commercial* activity of selling insurance: Commonwealth ex rel. Schnader v. Fidelity Land Value Assur. Co., 312 Pa. 425, 167 Atl. 300 (1933); Commonwealth v. Equitable Beneficial Association, 137 Pa. 412, 18 Atl. 1112 (1890). From the foregoing, we conclude that employer-sponsored insurance plans which

---

1. Section 902(a) of the Tax Reform Code of 1971, Act of March 4, 1971, P.L. 6 (No. 2), 72 P.S. §7902(a), imposes upon every insurance company transacting insurance business in the Commonwealth a tax at the rate of two percent of the gross premiums received from business done within the Commonwealth during each calendar year.

assume part or all of the risk of indemnity to employes do not constitute the transaction of insurance business under Pennsylvania insurance laws, and are not subject to regulation by the Insurance Department.

Moreover, the recently enacted Pension Reform Act, supra, specifically regulates employer-sponsored programs and exempts them from regulation under State insurance laws. Section 3(1) of the act, 29 U.S.C. §1002(1), defines such a program as an "employee welfare benefit plan,"[2] while section 4(a), 29 U.S.C. §1003, subjects such plans to regulation under the act. Section 514(b)(2)(B), 29 U.S.C. §1144(b)(2)(B) provides:

"Neither an employee benefit plan described in section 4(a), which is not exempt under section 4(b) (other than a plan established primarily for the purpose of providing death benefits), nor any trust established under such a plan, shall be deemed to be an insurance company or other insurer, bank, trust company, or investment company or to be engaged in the business of insurance or banking for

---

2. "The terms 'employee welfare benefit plan' and 'welfare plan' mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 302(c) of the Labor Management Relations Act, 1947 (other than pensions on retirement or death, and insurance to provide such pensions).": Pension Reform Act, §3(1), 29 U.S.C. §1002(1).

purposes of any law of any state purporting to regulate insurance companies, insurance contracts, banks, trust companies, or investment companies."

Accordingly, where an employer assumes full responsibility for paying out benefits, the plan would be governed completely by the Pension Reform Act. Where a minimum premium agreement is in operation, the employer's liability under its own plan would be regulated by the Pension Reform Act, but the premium agreement and any other contractual relationships between an employe benefit plan and an insurer would remain subject to regulation by State law, as would any act or omission involving an employe benefit plan which occurred before January 1, 1975. See section 514(b) of the Pension Reform Act, 29 U.S.C. §1144(b).

## II

The question with respect to the operation of administrative service plans is whether such an activity falls within the scope of an insurance company's charter. Section 208(a) of the Insurance Department Act of 1921, 40 P.S. §40(a), requires an insurance company to obtain a certificate of authority from the Insurance Commissioner before it may engage in the business of insurance. Section 202 of the Insurance Company Law of 1921, 40 P.S. §382, delineates the various classes of insurance that may be offered in the Commonwealth, but nowhere authorizes only the administration of claims in an insurance program provided by another organization.

The test for determining whether a particular corporate act is proper under the corporate charter or is ultra vires was stated in Malone v. Lancaster

Gas, Light & Fuel Co., 182 Pa. 309, 37 Atl. 932 (1897). In Malone, the Supreme Court held that a company chartered to manufacture and supply illuminating and heating gas might properly engage in the sale of appliances designed to use such gas, stating:

"In considering such questions, much weight must be allowed to the judgment of the parties most interested, the officers and stockholders of the corporation itself; and while they will not be permitted as against the commonwealth or a dissenting stockholder, to go outside of their legitimate corporate business, yet *where the act questioned is of a nature to be fairly considered incidental or auxiliary to such business, it will not be unlawful because not within the literal terms of the corporate grant.*": 182 Pa. at page 322, 37 Atl. at page 933 (emphasis supplied).

This line of reasoning was employed by the Supreme Court to uphold real estate transactions conducted by a life insurance company, notwithstanding a prohibition under article XVI, sec. 6, of the 1874 Constitution against any corporation engaging in a business other than that expressly authorized in its charter: Levis v. New York Life Ins. Co., 358 Pa. 57, 55 A. 2d 801 (1947).

In the normal course of transacting insurance business, insurance companies administer the payment of claims, and they would clearly do so in minimum premium agreements for those claims in excess of the liability assumed by the employer-insurer. For an insurance company to administer the payment of claims for the employer-insurer as well, whether as part of a minimum premium agreement or as a separate contract with an employer insuring 100 percent of a benefit plan,

would simply be an extension of its normal business function, and would properly be termed "incidental or auxiliary" to its insurance business. Not only would the same facilities of the insurance company be utilized, but such activity might reasonably be expected to conserve, if not increase, the group life and accident and health business already transacted by such company. Consequently, it is our opinion that it is proper under Pennsylvania insurance laws for insurance companies to engage in administrative service plans.

Moreover, the Pension Reform Act contemplates the administration of employer-benefit plans by insurance companies, and subjects the companies to Federal regulation insofar as they act in that capacity. Section 3(21) of the Act, 29 U.S.C. §1002(21), provides, in relevant part:

"(A) Except as otherwise provided in subparagraph (B), a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under section 405(c)(1)(B)."

Part 4 of Title I of the act establishes the scope and standards of fiduciary responsibility. It requires that every employe benefit plan place all the assets of an employe benefit plan in trust, to be administered by one or more fiduciaries named in the written plan instrument. See sections 403(a)(1)

and 402(a)(1), 29 U.S.C. §§1103(a)(1), 1102(a)(1). Section 404, 29 U.S.C. §1104, delineates the duties of fiduciaries, while section 405, 29 U.S.C. §1105, establishes the liability for breach of such responsibility.

The application of section 403(a)(1) does not extend "to any assets of a plan which consist of insurance contracts or policies issued by an insurance company qualified to do business in a state.": 29 U.S.C. §1103(b)(1). This exemption, however, only relieves certain employers from placing the assets of an employe benefit plan in a trust; but does not remove the obligation of an employer or insurance company to adhere to the fiduciary responsibility requirements of the Pension Reform Act. A minimum premium agreement or administrative service plan may be viewed as part of the overall employe benefit plan, and to the extent that such a contract is involved in a benefit plan, the Pension Reform Act standards of fiduciary responsibility are applicable to insurance companies.[3] At the same time, existing State laws and regulations governing the activities of insurers, including, but not limited to, approval of forms and the responsibility of the Insurance Commissioner to insure that no insurance company undertakes activities that would impair its solvency or its ability to pay claims under its policies, continue to apply to insurers in their dealings with employe benefit plans.[4]

---

3. As noted above, supra, note 2, the term "employee welfare benefit plan" covers any plan or program providing specified benefits *through the purchase of insurance or otherwise* (emphasis supplied).

4. Section 514(b)(2)(A), 29 U.S.C. §1144(b)(2)(A), provides: "Except as provided in subparagraph (B), nothing in this title shall be construed to exempt or relieve any person from any law of any state which regulates insurance, banking, or securities."

In summary, it is our opinion, and you are hereby advised, that employer-sponsored benefit programs and attendant minimum premium agreements and/or administrative service plans are legal under Pennsylvania insurance laws and the Pension Reform Act, and that the Federal act preempts State regulation with respect to employe benefit plans and their administration, except with regard to any contractual agreement between such a plan and a bank, insurance company or other entity whose activities are regulated by any statute or agency of this Commonwealth.